In re Estate of FINLEY MCDONALD, Deceased, FARMERS' EXCHANGE BANK, Appellant, v. FINLEY MCDONALD, Executor, Appellee.

**Partnership:** EVIDENCE. In this proceeding to enforce the payment of
1   partnership notes against the estate of a decedent, on the theory that he was a member of the partnership, the evidence is held insufficient to establish the partnership relation.

**Same:** PARTNERSHIP LIABILITY: ESTOPPEL. One may be estopped by
2   his acts and conduct to deny liability as a partner, although not in fact a member of the firm; and one holding himself out, or knowingly permitting himself to be held out to another as a partner, may be liable for partnership indebtedness to one in good faith relying on the assumption of the partnership relation, although the relation did not in fact exist. Where, however, such a firm creditor knew or had good reason to know that such pretended partner was not in fact a partner an estoppel does not exist; as a creditor of the firm must show that he would not have extended the credit, unless he knew or had reason to know that such person was a member of the firm.

**Same:** PARTNERSHIP LIABILITY: EVIDENCE. In this action the evidence
3   is held insufficient to show that decedent held himself out, or permitted himself to be held out, as a member of the partnership liable on the notes in suit.

**Evidence:** STATEMENTS OF A DECEDENT. Although the statements of a
4.  deceased person are admissible in evidence, when made many years

before and are detailed from memory only, they are not entitled to great weight.

*Appeal from Polk District Court.*—HON. LAWRENCE DE GRAFF, Judge.

MONDAY, DECEMBER 14, 1914.

OPINION states the case.—*Affirmed.*

*Dale & Harvison,* for appellant.

*Wilkinson & Wilkinson* and *Hunn & Jones,* for appellee.

GAYNOR, J.—On the 28th day of February, 1908, the plaintiff herein, the Farmers' Exchange Bank of Ankeny, filed its claims against the estate of Finley McDonald, Sr., in which it states: That Finley McDonald died on November 20, 1907. That he left a will. That the will was duly probated, and that Finley McDonald, Jr., his son, was duly appointed executor. That on the 19th day of December, 1905, Finley McDonald, Sr., was a member of the partnership or firm of F. McDonald & Sons, and on said date the firm executed and delivered to the First National Bank of Winterset its promissory note, signed F. McDonald & Sons, for $260 and on the 8th day of May, 1906, Finley McDonald, Sr., being still a partner, the firm executed and delivered to the First National Bank of Winterset a note for $616.21, and on the 8th day of August, 1906, it executed and delivered to said First National Bank of Winterset its two promissory notes, one for $1,300 and one for $1,500, signed Finley McDonald & Sons. That on the 27th day of May, 1907, the said bank, for a valuable consideration, transferred said notes to this plaintiff, and this plaintiff is now the owner thereof, and asks that its claims be established based upon said notes, against the estate of Finley McDonald, Sr. On July 13, 1909, the executor, Finley McDonald, Jr., filed an answer, denying practically each and every allegation of

plaintiff's claim, except that Finley McDonald, Sr., died at the time alleged, and that this defendant is the executor of his last will and testament. On January 17, 1913, four years after the filing of the answer, the plaintiff filed the following amendment to its petition:

That during the transactions mentioned in plaintiff's petition, and for a long time prior thereto, up to the 27th day of May, 1907, the said Finley McDonald, Sr., held himself out to the general public and to the First National Bank of Winterset as a member of the firm of F. McDonald & Sons, and responsible for and liable upon notes signed by his son John F. McDonald under and with the firm name of F. McDonald & Sons, and that John F. McDonald, with full knowledge, consent, and approval of Finley McDonald, Sr., held out to the public generally, and to said bank and to this plaintiff, that his father, Finley McDonald, Sr., was a member of the firm of F. McDonald & Sons; that, relying upon said representation, the plaintiff purchased the notes in question, and would not have purchased them except for such representations, and alleges that Finley McDonald, if living, would be, and his executor is now, estopped and barred from denying that Finley McDonald, Sr., was a member of said firm.

This amendment was filed the next day after the trial had been begun.

Upon the issues thus tendered, the cause was tried to the court as an equitable action, by consent of both parties, and upon the conclusion of the trial and its final submission, the court made the following findings of fact, to wit: That said Finley McDonald, Sr., was not a partner of his son, John F. McDonald; that the said Finley McDonald, Sr., did not hold himself out to the plaintiff as a partner of his said son; that, therefore, the plaintiff's petition should be dismissed at its costs, and judgment was entered, dismissing the petition at plaintiff's costs. From this action, the plaintiff appeals, and assigns the following errors as grounds for reversal.

(1) The court erred in failing to find that Finley McDonald, Sr., was a member of the firm of F. McDonald & Sons.

(2) And in failing to find that said Finley McDonald, Sr., had held himself out to the public generally, to the knowledge of the plaintiff, as a member of said firm, and was liable accordingly.

(3) And in failing to find that said Finley McDonald, Sr., permitted his son, John F. McDonald, to hold him out to the public generally, to the knowledge of the plaintiff, as a member of said firm, and was liable accordingly.

(4) And in failing to find that said Finley McDonald, Sr., had held himself out to the plaintiff in particular as a member of said firm, and was liable accordingly.

(5) And in failing to find that said Finley McDonald, Sr., permitted his son, John F. McDonald, to hold him out to the plaintiff in particular as a member of said firm, and was liable accordingly.

(6) And in failing to find that said Finley McDonald, Sr., if living, would be, and that defendant, as executor of his estate, was, estopped from denying liability upon the notes in suit.

The following appears to be without controversy in this record: That Finley McDonald, Sr., during all his life, was a farmer; that he went to Madison county in 1901, and lived on a farm about five or six miles from Winterset until October 5, 1905; that on March 1, 1906, he removed to the town of Ankeny, and later moved from there to the city of Des Moines, at which place he died; that he never was engaged in any other business than that of farming; that the notes in suit were given by his son, John F. McDonald, for overdrafts on the First National Bank of Winterset. It does not appear for what purpose this money was used that John F. McDonald obtained by means of these overdrafts. It does appear that John F. McDonald kept an account at the First National Bank of Winterset in the name of Finley McDonald & Sons; that the overdrafts arose by reason of checks drawn by John F. McDonald, and charged by his direction, to the account of Finley McDonald & Sons. It appears that, at the time these notes were given, John F. McDonald had overdrawn at this bank the amount of these

1. PARTNERSHIP: evidence.

notes; that the notes were made and executed, at the time stated in plaintiff's petition, to satisfy these overdrafts. It does not appear that Finley McDonald, Sr., was in any way interested in the money procured by means of these overdrafts. It does not appear that he received any of the money, or that the same was used in any business enterprise, or for the purchase of any property, in which Finley McDonald, Sr., was interested. It does not appear that Finley McDonald, Sr., knew, at the time, that his son John F. was carrying an account in the Winterset Bank, under the name of Finley McDonald & Sons. It does not appear that he knew that John was checking against any such account. It does not appear that he knew of these overdrafts, or the giving of these notes in question, until some time after they were given. The notes in question were assigned to the plaintiff on the 27th day of May, 1907, without recourse. Finley McDonald, Sr., died November 29, 1907. His son John F. McDonald died October 17, 1908. These notes were filed as a claim against the estate of Finley McDonald, Sr., on the 28th day of February, 1908.

There is no evidence of any agreement of partnership between Finley McDonald, Sr., and any of his sons, or that he had any personal interest in any of the business carried on by John F. McDonald, under the name of Finley McDonald & Sons, or otherwise, or that he was personally engaged, or in any way concerned, in any of the business carried on by John F. McDonald, under that name, or any other name. So far as this record discloses, Finley McDonald and Sons was but a name under which John F. McDonald transacted his own business. We do not find anything in the evidence that shows that a partnership actually existed between Finley McDonald, Sr., and John F. McDonald, or that they had any business transactions of a partnership nature, or that any business was carried on by Finley McDonald, Sr., in connection with any of his sons, under the name of Finley McDonald & Sons, or that he had any interest in any business carried on under that name. It does not appear what the business of the alleged firm was, or that it had any business.

Upon this record, we dismiss the claim made by the plaintiff, that Finley McDonald, Sr., was, in fact, a partner of his sons, conducting business under the name of Finley McDonald & Sons.

The plaintiff, however, claims in the amendment filed to its petition four years after the answer was filed, and after the trial of the case had been begun, that Finley McDonald, Sr., held himself out to the public, and to the First National Bank of Winterset, as a member of the firm of McDonald & Sons, and responsible for and liable upon notes signed by his son, John F. McDonald, under that name; that John F. McDonald held out to the public generally, and particularly to the First National Bank of Winterset, and to the plaintiff bank, that his father was a member of the firm of Finley McDonald & Sons, and liable with him for all notes signed by him, John F. McDonald, under the name of Finley McDonald & Sons, and that he did this with the full knowledge, consent, and approval of Finley McDonald, Sr.; that in purchasing these notes from the Winterset Bank, the plaintiff relied upon this fact and paid full value for the notes, and would not have done so if it had not been for these representations.

This presents a different question, for the law is well settled that a person may be estopped by his conduct to deny liability as a partner, though not in fact a member of the firm, and it is well settled by authority that one holding himself out to another as a partner, or knowingly permitting himself to be so held out, although no partnership exists, may be liable to one who, relying upon such conduct and believing that a partnership exists and that he is a partner, deals with the alleged partnership on that assumption.

2. Same: partnership liability: estoppel.

That is based on the doctrine of estoppel, and denies to him the right to gainsay that which, by his conduct, he lead the other person to believe was true, and in reliance upon which the other person in good faith acted. Thus where one asserts a fact to be true, and another, in good faith, relying

upon the assertion, acts so that to deny it would be prejudicial to him, the party making this assertion cannot afterwards, under such circumstances, assert to the contrary to the prejudice of the other. But in order to create an estoppel it must appear that the other party relied upon the statements made, believed them to be true, and acted upon them, and that to permit a denial thereafter would work prejudice.

As stated in *Sheldon v. Bigelow,* 118 Iowa, 586, quoting from page 590:

The liability created by one who is not in fact a partner, by holding himself out as such, is based on the doctrine of estoppel, and rests wholly upon the ground that he may not deny the relation which he has by his own act or by his consent permitted others to believe existed, and there is no legal or equitable reason why one who has not relied upon his conduct should hold him liable as a partner.

It is further stated in Elliott on Contracts, vol. 5, section 4938:

The wrongful act or omission that is relied upon to create an estoppel must, it seems, have been acted on in good faith by the party in whose favor the same is sought to be invoked— citing authorities. Should the latter have no knowledge, at the time the contract is entered into, that the person against whom he subsequently seeks to enforce liability was being held out as a partner, an estoppel does not exist in his favor, any more than it does when he knew of the holding out, but also knew that the parties were in reality not partners.

Even though one, not a partner in fact, held himself out to the general public as a partner, yet to one who knew that he was not a partner, or who had no reasonable ground for believing that he was a partner, such holding out would not work an estoppel. Or, in other words, where the creditor who invokes the estoppel knew of the holding out, but also knew that the parties were not partners, no estoppel is created, and no liability can be enforced on that basis. There is no legal or equitable reason why one, who has not relied upon the state-

ments or conduct of the party sought to be charged as a partner, should be permitted to hold him as a partner. One cannot be said to be deceived by what he knows is not true. One cannot be said to have relied upon what he knows does not exist. One, in giving credit to an existing partnership, cannot be said to have extended credit to one whom he knows not to be a partner. That is, an estoppel does not exist where the party extending credit knew, at the time of extending the credit, that the person against whom he subsequently seeks to enforce liability was not a partner. Nor can he hold him liable where, from the facts and circumstances within his knowledge, the manner in which the business was transacted, the character of the business done, by whom done, he had no reason to believe that the party sought to be charged was, in fact, a partner at the time of the transaction. The whole theory of the estoppel to deny partnership liability rests upon the assumption that the creditor was justified in assuming that the party sought to be charged as a partner was, in fact, a partner at the time of the transaction; that he did so believe, and, resting in such belief, extended the credit. But this belief, to justify an estoppel, must be founded upon facts and circumstances known to the creditor at the time; that supposing him to be a man of ordinary prudence and judgment was sufficient to justify that belief.

Where no partnership in fact exists, and one is sought to be held as a partner on the grounds that he held himself out as such, it must appear, not only that he held himself out as a partner, but that the other, in good faith, believed him to be a partner, and extended the credit upon that supposition, but the belief must be induced by the conduct of the party sought to be charged. He cannot be made liable as a partner because held out to be such by others, unless it affirmatively appears that such was done with his knowledge, or consent, or concurrence, or by silence amounting to acquiescence. Usually the question whether one is liable as a partner, because so held by himself, or, with his consent, by others, turns on the force

and meaning of his acts. This is a question of fact to be determined from all the evidence, and all the facts and circumstances disclosed in the record touching this question.

There are cases holding (and this holding appeals to our reason as just and equitable) that, as to the creditor invoking an estoppel, thereby enforcing a liability which would not exist except for the estoppel, it must appear that he exercised due diligence in ascertaining the truth of the facts upon which he predicates the estoppel. See *Morgan v. Farrell*, 58 Conn. 413 (20 Atl. 614, 18 Am. St. Rep. 282), from which we quote as follows:

A person who holds himself out as a partner, or permits others to do so, is liable as such to third persons who have given credit to the firm upon the faith of his connection with it, or who knew of such holding out. The liability in such cases is predicated upon the doctrine of estoppel, and in order to charge a person on that ground it is not enough to show that he was represented by others to be a partner, or that his name appeared in the firm; it must be shown that he knew that he was being held out as a partner, and that he assented thereto, or facts from which assent can be fairly implied (citing *McBride v. Protection Ins. Co.*, 22 Conn. 259; *Buckingham v. Burgess*, 3 McLean, 364, Fed. Cas. No. 2,087). It is always a question of fact whether or not there has been such a holding out as to estop a party from denying the partnership.

It is said in this same case:

A party setting up an estoppel by conduct is bound to the exercise of good faith and due diligence to know the truth (citing Bigelow on Estoppel, 480; *Moore v. Bowman*, 47 N. H. 499; *Odlin v. Gove*, 41 N. H. 465, 77 Am. Dec. 773).

Applying these general principles concretely to the case under consideration, we are of the opinion that the evidence does not justify holding the estate of Finley McDonald, Sr., liable for the notes in suit, either on the theory that he was in fact a partner, or on the theory that his estate is now estopped to deny that he was a partner or member of the firm of Finley McDonald & Sons, if any such firm ever in fact existed.

3. SAME: partnership liability: evidence.

S. D. Alexander, called on the part of the plaintiff, testified:

I was vice president of the First National Bank of Winterset. I became connected with the bank January 1, 1904, and had been vice president two or three years at the time the notes were discounted to the plaintiff. W. S. Weldon was cashier at the bank. He and I were in the active management. I handled some of the transactions in which the notes in question were given. I was acquainted with Finley McDonald, Sr., four or five years before his death.

In speaking of the notes in controversy, he said:

There were other notes given for the same indebtedness now represented by the notes in suit. None of them were signed by Finley McDonald, Sr. Finley McDonald, Sr., had an individual account in the Winterset Bank, a checking account. He had considerable money in there and in the vault. Finley McDonald, Sr., at the time these notes were given, lived six or seven miles from Winterset.

Testifying on the question as to Finley McDonald, Sr., holding himself out as a partner, Alexander said:

At different times these notes were changed, added together, I think. Sometimes other notes were given for interest, and he [referring to Finley McDonald, Sr.] definitely told me that whatever the boys did, he was connected with. With respect to the notes in suit, the elder McDonald, now deceased, was there at the bank, and told me that whatever the boys did was all right. When it came to the matter of the collection of the notes, I was particular to look after them and find out who was responsible on them. I was given to understand, both by John F. and his father, that they were both responsible for the notes. One time, when they were both present, I said, 'I want to know who constitutes this firm?' At this particular time, the old gentleman and John F. had a transaction in the bank. I think it was to adjust another note, or to give a new one. I recall that a note was made at the time of this conversation. Whether it was a new note or a renewal I am not able to state, but they were both there at the time. That is the instance that I have just mentioned.

The new note was signed by John McDonald, the same as the notes in suit. It was signed in the presence of his father.

At one part of his testimony he said:

On one particular instance, I know that Finley McDonald, deceased, was there, and he stood right beside John F. when he executed some of these notes.

He evidently referred to this note just mentioned, for further in his testimony he said:

The first time I spoke to him about these notes that are signed Finley McDonald & Son was when he came into the bank just before the notes were assigned to the plaintiff bank.

He further said:

I was inquiring closely into the matter to learn who was responsible on the notes because the board of directors had told me to do it. I am not interested in the bank at this time. The first time I spoke to him [meaning Finley McDonald, Sr.] about these notes that are signed Finley McDonald & Sons was when he came into the bank that morning at the time I speak of. 1 cannot give the exact date, but it was just a short time before the notes were turned over to the plaintiff bank, May 27, 1907. I don't think he said anything about a partnership. He said anything that the boys did was all right; that he would back it up. It was after he had moved to Des Moines that I had the talk with him in the Winterset Bank.

From this testimony it is apparent that any talk that Alexander had with Finley McDonald, Sr., referred to in his testimony, was long after the notes in suit were given. The first two notes in suit were payable on demand. The third note was payable August 20, 1906, and the fourth note September 8, 1906.

W. S. Weldon, referred to in the testimony of Alexander, testified that he was cashier of the Winterset Bank for a good many years. Resigned in March, 1909. Was connected with

the bank a little over 20 years. Did most of the work, and had a general knowledge of what was going through the bank. Was acquainted with both John F. McDonald and Finley McDonald, Sr. Knew Finley McDonald, Jr., a son of Finley McDonald, Sr., for several years. John F. was a son of Finley McDonald, Sr. He carried an account at the Winterset Bank. F. McDonald, Sr., also carried an account in his own name. He said that he had no knowledge as cashier of the Winterset State Bank of any transaction in which Finley McDonald, Sr., was associated as a partner or otherwise with John F. McDonald. He said that Finley McDonald, Sr., had nothing to do with the execution of the notes in suit; that Finley McDonald, Sr., never, to his knowledge, knew anything of these notes; that John F. McDonald signed the four notes in suit; that he was cashier when they were executed and that they are in his handwriting. He testified:

I do not know whether Finley McDonald, Sr., knew or had any knowledge of John F. McDonald's conducting his account or signing the name of Finley McDonald or Finley McDonald & Son. I never talked with Finley McDonald, Sr., concerning these matters, or any matters concerning John F.'s business. Never had a word with him. These notes were given for overdrafts on John F. McDonald's account. John was quite a hand to overdraw his account. I continually called him to come in on it. So far as I know, these notes were made from checks executed and used by him in his own business, and not that of his father. At least, I supposed so. I never knew of Finley McDonald's receiving any of the money for which these notes were given. As a prudent cashier, I was in the habit generally, when I gave a loan, of making inquiry, more or less, of the use the borrower was going to make of the money.

He had a great many conversations with John F. McDonald. He testified further:

The account of John F. McDonald, to which I have referred as shown by the passbook, was carried in the name of F. McDonald & Sons, and was carried in that name on the

books of the bank. It was understood, between John F. and the bank, that they were to.be charged to that account.

A. C. Miller, called for the plaintiff, testified:

The notes in suit belonged to the Farmers' Exchange Bank of Ankeny. They were discounted by the plaintiff bank May 27, 1907. John F. McDonald owed the plaintiff at that time. We were trying to get security, and we took up the notes in suit from the First National Bank of Winterset, and they made us deeds to certain properties which they held as collateral to these loans. The collateral was put up by John F. McDonald to the Winterset Bank. The collaterals were made to me by Sumner and wife. At the time these notes were purchased by the plaintiff bank and assigned to it, Finley McDonald, Sr., was not there. The plaintiff bank paid the Winterset Bank for these notes by draft. The draft is for a sum greater than the sum of the four notes in suit, and includes an overdraft which the Winterset Bank claimed against John F. McDonald.

In connection with the investigation whereby the plaintiff bank obtained the notes in suit, John F. McDonald signed the following paper:

For the purpose of helping to perfect a settlement between myself and the Farmers' Exchange Bank of Ankeny, and the First National Bank of Winterset, Iowa, I hereby say to you that as soon as I procure from my brother, title and possession of the livery stable, and real estate on which it is located, together with all the live stock and livery outfit, that I will execute to you a bill of sale thereon as additional security above and other than already executed and delivered to you this day by myself and the First National Bank of Winterset. I further state that the bill of sale which was made recently by me to my brother Findley McDonald was for the purpose of securing him for a loan of $2,950.00 which is the full amount of my indebtedness to him. I further state that the firm of McDonald & Sons, consisted at the time certain notes were executed and delivered to the First National Bank of Winterset, and which notes have this day been turned over to the Farmers' Exchange Bank of Ankeny, Iowa, were the

joint notes of Finley McDonald, Sr., Finley McDonald, Jr., and myself, who are all liable therefor.

Miller further testified:

John F. owned all the collateral that was turned over to the plaintiff bank by the Winterset Bank. I took an assignment of the notes in suit, without recourse, on the strength of the collateral, and the representations made by the Winterset Bank in regard to them by the vice president of the bank. Upon discounting the notes, I undertook to learn whether the notes were good, independent of the collateral. I was told by Mr. Alexander that Finley McDonald, Sr., who was a party to the signature there and to the notes in suit, was absolutely responsible. I mean by that that he was financially responsible, and the notes were good with his signature.

J. G. Wagner testified for the plaintiff as follows:

I have been connected with the plaintiff bank for a number of years as cashier, and have had the active control and management of the bank during that time. Was acquainted with Finley McDonald, Sr., and also with his son John F. They resided at Ankeny about 1905 or 1906. I have no interest in the plaintiff's business. Am paid a salary for my services. About December 1, 1905, the plaintiff bank made a loan of money to John F. McDonald, Finley McDonald, Sr. They came to the bank and wanted to borrow $1,300. We had a little talk as to how they gave their notes. Finley McDonald, Sr., told me they signed their notes Finley McDonald & Sons, and that they were liable for them; that they meant himself and John. In making the loan, I understood Finley McDonald, Sr., was financially good, but I don't know much about John. This conversation was before the loan was actually made. I consented to the loan on these conditions. The loan was evidenced by a note signed by John F. in the presence of his father. The note was signed Finley McDonald & Sons. The note was paid March 5, 1906. Finley McDonald, Sr., was interested in this transaction in which the loan was made. John F. had a checking account with us. The father never checked on that account. The father never had an account in his own name, or in the name of Finley McDonald & Sons. His only transaction with the bank was the time the

note was given for $1,300 in the presence of the father and signed Finley McDonald & Sons. That is the only business Finley McDonald, Sr., ever transacted in the plaintiff bank in connection with the partnership of Finley McDonald & Sons. John McDonald subsequently paid the note by his individual check. I was present at the time the notes in question were discounted by plaintiff bank. The object in getting the notes was to get what securities were held for John to be turned over to us as security for all that John owed the bank. At the time the $1,300 loan was made, December 1, 1905, Finley McDonald, Sr., said they were liable for the note.

Finley McDonald, Jr., called as a witness, testified:

I have lived at home and worked for my father all the time on a farm except the year 1895. My father was never engaged in any business except farming. I never knew anythink about an account in the Winterset Bank in the name of Finley McDonald & Sons. I was never connected with that in any way, or with John in any business. John did, a time or two, pass title to some of his property through me. I was never connected with any firm known as Finley McDonald & Sons. Never knew of such a firm.

This is practically all the competent testimony.

Let us examine this record and see what it shows, what it does not show, and what it might have shown had the fact existed on which the liability of this dead man's estate depend.

This case, by consent of both parties, is triable *de novo* here. It is therefore our duty to examine the evidence, weigh it, and therefrom determine what the ultimate fact is on which liability is predicated. Evidence is only a means through which the mind of the trior is brought to a knowledge of the facts. The conduct of the parties has often more probative force in directing the mind to a knowledge of the truth than even their verbal testimony as to what the fact is.

Finley McDonald, Sr., lived on a farm only six miles from Winterset. He was a man of means. Had money in this bank, both on deposit and in its vaults. These notes were given for

overdrafts made by John F. McDonald on this bank. It does not appear when these overdrafts occurred. The cashier says he was continuously overdrawing his account, and had to be called in, and he gave these notes in settlement. These notes were given in 1905. The last note was due September 8, 1906. It appears that Finley McDonald, Sr., was never notified of these overdrafts, nor that notes were given in settlement, or that the notes existed, either by the Winterset Bank or the plaintiff bank, although he lived until the 29th day of November, 1907. It nowhere appears that he had any notice or knowledge that John was carrying an account in this Winterset Bank under the name of Finley McDonald & Sons, or that he was giving notes in that name in liquidation of his overdrafts. No demands were ever made upon him for the payment of these notes, although the bank was urging John for and taking collateral from him to secure them. It appears that all the collateral that was put up to secure them was the private property of John F. It appears that the notes were sold to the plaintiff bank at a discount. During all this time, the old man was amply good for the full amount of the notes if thought by the bank to be beholden for them. At the time the notes were discounted the old man resided in Des Moines. The sale of the notes was consummated at a bank in Des Moines. He could have been easily reached had the plaintiff bank desired assurance upon the now disputed notes. He was not present at the time; he was not notified of this meeting; he was not consulted in any way. Instead the bank took the statement of John, hereinbefore set out. No claim was made that he was liable until after his death. The plea of estoppel relied upon here was not filed until after John's death. In no conversation testified to does any witness say that the old man ever said that a partnership existed, or that any partnership existed between him and John, nor does any witness testify as to the existence of any partnership carried on in that name, or that any business was carried on by either John or the old man under that name. It does not appear that

John was engaged in any business; that he carried on any business whatever in that name, or that any property was bought or held or owned by any such partnership. The most that appears is, that without the knowledge of the old man John kept his account in this bank under the name of Finley McDonald & Sons, and gave notes, in that name, in liquidation of his own overdrafts.

The parties who testified to statements made by the old man, though perhaps not legally barred by the statute, were apparently friendly to the plaintiff. Their testimony was given at least six years after the claimed statements were made. It was given from memory.

4. EVIDENCE: statements of a decedent.

There is no record of anything that the old man did or said that could mislead these parties as to the alleged partnership. It has been frequently held by this court that no species of testimony is more dangerous, or received with greater caution, than evidence of admissions made by the opposite party. Evidence consisting of the repetition of oral statements, of necessity, is subject to imperfection and mistake. Though perhaps, not intentionally so, it is due, perhaps, to misunderstanding on the part of the hearer, or imperfection of memory as to what was, in fact said, or a misinterpretation of the words and their meaning as actually spoken. In repeating any conversation, the mere changing of a word may change the whole meaning and import of what was said, and what should have been understood from what was said.

It is not claimed that there was any conduct, on the part of the deceased, that tended in any way to show that he had any connection, as a partner, in his son's business. Reliance is had upon two conversations, both had at a time when the old man and his son were transacting business (in which they were both concerned), so far as this record shows, of a private nature, and John had signed the name Finley McDonald & Sons to a note given at the time. Undoubtedly the cashier, knowing that these two were borrowing this money, directed the old man's attention to the fact that the note was signed

"Finley McDonald & Sons," and thereupon made inquiry. On December 1st, 1905, plaintiff bank made a loan to John F. McDonald and Finley McDonald, Sr. We take it that after John had signed the note for their joint obligation, "Finley McDonald & Son," he questioned it somewhat. The borrowing of the money, the conversations, and the signing of the note, were all had at the same time. Finley McDonald, Sr., said they were both liable on the note. The only question that could have interested this cashier at that time was whether or not John's signing the note in that way bound the old man, and he took the note because the old man said, as he testified on direct examination, "We are both liable upon the note," meaning evidently the note then in question, and given for the money then borrowed.

On the whole record, our conclusion supports the finding of the learned district judge, and the cause is therefore—*Affirmed.*

LADD, C. J., and DEEMER and WITHROW, JJ., concur.